FILED
JUN 27 2018
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| L.B. HAILEY LIMITED PARTNERSHIP § <br> § <br> PLAINTIFF, § <br> § <br> v. § <br> § <br> ENCANA OIL & GAS (USA) INC. § <br> § <br> DEFENDANT. § | Civil No. 5:17-cv-00149-RCL |

**Memorandum Opinion:**
Granting Plaintiff's Motion for Leave to File Amended Complaint [ECF No. 13]
Granting in Part and Denying in Part Defendant's Motion to Dismiss [ECF No. 8]
Denying Defendant's Motion to Continue on Response as Moot [ECF No. 14]

Before the Court is Defendant Encana Oil & Gas (USA) Inc.'s ("Encana") Motion to Dismiss Plaintiff L.B. Hailey Family Limited Partnership's ("LBH") Complaint on the grounds that LBH failed to state a claim upon which relief could be granted. FED. R. CIV. P. 12(b)(6). For the reasons below, the Court GRANTS Encana's motion to dismiss with respect to LBH's causes of action for breach of contract and violation of the TEXAS NATURAL RESOURCES CODE, as well as its declaratory judgment cause of action; and DENIES Encana's motion to dismiss with respect to LBH's causes of action for breach of contract related to accounting and LBH's claim to attorney's fees. Because LBH's amended complaint was considered in this opinion, LBH's motion for leave is GRANTED; LBH's motion to continue on response is DENIED as moot.

I.  **Background**

This case involves two nearly identical leases covering land in Karnes County, Texas. The leases differ only in that one requires a twenty-percent royalty, whereas the other has been amended to provide a twenty-five percent royalty. LBH is the lessor. Through a sequence of

1

assignments, Encana became the lessee in 2014. Producing wells were drilled and completed by both a predecessor-in-interest and Encana between 2011 and 2016.

Encana is the current operator of the leaseholds and the wells on this land. LBH requested in March 2016 that Encana provide an accounting of production from the wells and the royalties and expenses associated with that production. LBH also requested that Encana stop deducting post-production expenses from LBH's royalty payments. LBH repeated its requests in June of 2016, and Encana replied shortly thereafter that while it disagreed with LBH's assertions, it would no longer deduct a processing fee or processing fuel charge. LBH sent two subsequent letters demanding that all deductions other than taxes cease. Encana reiterated its disagreement with LBH on the matter and stated it would not stop deducting post-production costs.

LBH filed suit against Encana in state court, alleging that Encana improperly deducted post-production expenses from LBH's royalty payments and that, despite LBH's complaints, the practiced has continued to happen. ECF No. 1, at 13. LBH claims these post-production costs deductions breach the lease agreements and violate TEXAS NATURAL RESOURCES CODE § 91.401, for which LBH seeks actual damages and statutory interest. *Id.* at 14. LBH also seeks a full accounting of production royalties paid under the leases and any deductions or adjustments to those royalties pursuant to sections 91.141 and 91.501-505 of the TEXAS NATURAL RESOURCES CODE. *Id.* LBH also seeks a declaratory judgment about Encana's royalty payments under Texas common law, as well as attorney's fees. *Id.*

Encana responded by engaging in jurisdictional discovery and removing the case to this Court on the basis of diversity. *Id.* at 3-4. Encana now requests that LBH's claims be dismissed for failure to state a claim, arguing that all of LBH's claims are premised on an incorrect interpretation of the lease's language and Texas common law. ECF No. 8, at 1, 10. The leases state

the royalty is valued "at the wellhead" and "at the well," and Encana argues that, under Texas common law, this language authorizes deducting post-production costs from the downstream sales price and makes any language to the contrary surplusage. *Id.* at 6-11. Therefore, Encana argues that any pleadings LBH could submit would not remedy the issue, as the law clearly favors Encana. *Id.* at 13. The parties do not dispute that these leases govern this claim, or that this Court has proper diversity jurisdiction over the dispute.

## II. Legal Standards

### a. 12(b)(6) Standard

When reviewing a Rule 12(b)(6) motion to dismiss, the court will accept all well-pleaded facts of the complaint as true and construe them in the light most favorable to the plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Per Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal is only appropriate if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).

### b. Texas oil and gas lease construction

In this diversity case, Texas law governs the interpretation of LBH's leases, and so the question of whether the lease is ambiguous is a question of law for the Court. *Warren v. Chesapeake Exploration, L.L.C.*, 759 F.3d 413, 415 (5th Cir. 2014). "In construing an unambiguous lease, our task is to ascertain the parties' intentions as expressed in the lease." *Id.* "We presume that the parties intended every clause to have some effect, and we give terms their plain and ordinary meaning unless the instrument reflects that the parties intended a different meaning." *Id.* "Texas law requires us to enforce an unambiguous lease as written." *Id.*

3

Under Texas common law, a royalty is understood to be free of production expenses, but typically bears "post-production costs, including taxes . . . and transportation costs." *Chesapeake Exploration, L.L.C. v. Hyder*, 483 S.W.3d 870, 872 (Tex. 2016). But parties may contract around this general rule such that a royalty does not bear post-production costs. *Id.* How such a "no-deductions clause" squares with a royalty that is valued at the well has been thoroughly addressed by both the Texas Supreme Court and the Fifth Circuit. The Texas Supreme Court held in *Heritage*, and later reaffirmed in *Hyder*, that parties may contract around having post-production costs deducted from a 'market value at the well' lease, and such clauses have been interpreted in light of these rulings by the Fifth Circuit in *Warren* and *Potts*. No-deductions clauses that do not alter the point of valuation do not accomplish this goal.

In the 1996 *Heritage* opinion, the Texas Supreme Court held that a certain no-deductions clause was "ineffective to free the ['market value at the well'] royalties from postproduction costs." *Hyder*, 483 S.W.3d at 876, discussing the holding of *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 130 (Tex. 1996). The court recognized that a wide variety of royalty clauses exist: "Some are based on 'proceeds,' some on 'amount realized,' while others are based on 'market value.' Some specify the point at which the value of the royalty is determined, such as 'at the well.' Some do not." *Heritage*, 939 S.W.2d at 125. The specific royalty clause at issue in *Heritage* the lessee to pay the lessor based on the "market value at the well" of the gas, "provided, however, that there shall be no deductions from the value of Lessor's royalty" for marketing the gas. *Id.* The Court held that when the royalty is based on the value of the gas at the well, "the concept of deductions of marketing costs from the value of the gas is meaningless." *Id.* At the well, the value of gas is "its value in the marketplace at any given point of sale, less the reasonable cost to get the gas to that point of sale, including compression, transportation, and processing costs." *Id.* Because

the value of the gas at the wellhead is calculated by deducting marketing costs from the actual sales price or comparable sales prices, there are no post-production costs to deduct from the value at the well. *Id.* Therefore, the no-deductions clause was not ambiguous, but merely surplusage; it "does not change the meaning of the royalty clause" and "add[s] nothing to the ['market value at the well'] royalty clause." *Id.* at 130-31.

Twenty years later, the Texas Supreme Court reaffirmed this holding in *Hyder*. The court again stated that royalties do not bear post-productions costs (although that general rule can be modified by agreement), and that royalties paid "on the market value . . . at the well" bear post-production costs and "should equal the commercial market value less the processing and transporting expenses that must be paid before" reaching the market. *Hyder*, 483 S.W.3d at 873. In contrast, royalties based on the price actually received for the product, or a "proceeds lease," do *not* bear post-production costs. *Id.* Any additional clarifying language is surplusage. *Id.* In *Hyder*, the Court found royalty language stating "25% of the price actually received by Lessee" to be a proceeds-type lease, and that additional language claiming the royalty to be "free and clear of all production and post-production costs and expenses" to be ineffective, because it simply repeats what is already true based on the royalty being based on actual proceeds. *Id.* at 871-72. The lease also included a clause stating that *Heritage* would not apply to the agreement. The Court held that such a disclaimer would not free a "market value at the well" royalty from post-production costs and would have no effect on a proceeds lease, which is already free from post-production costs— "the text of the lease itself" must accomplish that. *Id.* at 876. This is the ultimate lesson: the text of the royalty is what governs, not later clauses purporting to alter that language.

The Fifth Circuit applied *Heritage* in two similar cases —*Warren* and *Potts*. In *Warren*, the royalty clauses at issue stated that the lessor would receive a percentage of "the amount realized

by Lessee, computed at the mouth of the well." *Warren*, 759 F.3d at 416. "Amount realized" was interpreted to mean the royalty would be based on the price the lessor actually received for the gas. *Id.* at 417. While this language alone would have resulted in a proceeds-type lease, the "computed at the mouth of the well" language was held to sufficiently alter the clause to become substantially similar to a "market value at the well" clause. *Id.* The court interpreted the full clause to mean "the royalty is based on net proceeds, and the physical point to be used as the basis for calculating net proceeds is the mouth of the well." *Id.* (quoting *Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 136 (Tex. 1996) (internal quotations and citations omitted)). This entitled the producer to deduct post-production costs from sales proceeds. *Id.* at 418.

*Warren* also dealt with a no-deductions addendum that was found to have the same effect as the no-deductions clause in *Heritage*: none. *Id.* The no-deductions addendum did not change the point of valuation away from the well, which is the critical feature that allows the producer to deduct post-production costs. *Id.*

*Potts* also involved a royalties clause that computed royalties "at the mouth of the well," but presented a slightly different no-deductions clause. The no-deductions clause indicated "that *all* royalties shall be *free* of *all* costs." *Potts v. Chesapeake*, 760 F.3d 470, 475 (5th Cir. 2014). The Fifth Circuit held that this no-deductions clause should be treated just like the clause in *Heritage*. Where the royalty is valued at the well, "a 'net-back' method of calculation does not 'burden' or reduce the value of the royalty." *Id.*

It is clear from both Texas Supreme Court and Fifth Circuit holdings that, under Texas law, royalties bear post-production costs unless the parties agree otherwise through an effective 'no-deductions' clause. If the royalty is based on the market value of the product at the well (or similarly computed at the wellhead), post-production marketing costs are already deducted from

that amount. Thus, any no-deductions clause is unambiguous surplusage as it does not alter the point of valuation. If the royalty is a "proceeds lease" (i.e., based on the price actually received for the product), the royalty does not bear post-production costs. Thus, a no-deductions clause is surplusage as the royalty is already free of these costs. While parties are free to contract such that a royalty would not bear post-production costs, the text of the royalty clause itself is key to determining if a no-deductions clause is effective.

### III. Discussion

The central issues raised by the parties here are (1) whether the leases require 'proceeds' or 'at the well' valuation of royalty payments; (2) whether, regardless of how royalty payments are valued, the deduction of post-production costs is permitted by Texas common law; and (3) what effect clause 3(d) of the lease has, if any. For the reasons set out below, the leases at issue are not proceeds-type leases, but 'at the well' leases. Thus, they are subject to post-production deductions under Texas common law. Texas law also instructs that the no-deductions provisions of clause 3(d) have no effect, as they are unambiguous surplusage that does not alter the point of valuation for LBH's royalty. As such, LBH's claims for breach of contract related to royalty payments, violation of TEXAS NATURAL RESOURCES CODE § 91.401, and declaratory judgment regarding Encana's legal responsibilities regarding royalty payments under the lease fail.

At the outset, the Court will address LBH's concerns about the precedential value of *Heritage* and its Fifth Circuit progeny, *Warren* and *Potts*. LBH argues that *Heritage* has limited precedential value because, on rehearing, the original majority opinion was left with one vote, Justice Owen's concurrence had three, and four agreed with the dissent (the ninth justice recused himself). But this Court is bound not only by Texas Supreme Court opinions, but by Fifth Circuit opinions that interpret Texas law. And Justice Owen's concurrence in *Heritage* was subsequently

applied by the Fifth Circuit in both *Warren* and *Potts*, and reaffirmed in the Texas Supreme Court's holding in *Hyder*. LBH says that the Court should be wary of giving great weight to these Fifth Circuit opinions because they were written by Judge Owen and take the same position that she took in the *Heritage* case while she was on the Texas Supreme Court, a position that did not reach majority status. But this does not affect any case's precedential value. The Texas Supreme Court's opinion in *Hyder* clearly reaffirms that Justice Owen's concurrence in *Heritage* is binding precedent—*Heritage* is quoted at length, and is referred to in the opinion's explanation of the basics of Texas royalty common law. *Hyder*, 483 S.W.3d at 872-76. If the current Texas Supreme Court agreed with LBH's assertion that *Heritage* is limited in precedential value, it had the opportunity in *Hyder* to make that clear by directly abrogating it. Instead, it is restated as a basis for the Court's decision. As described above, *Heritage*, *Hyder*, *Warren*, and *Potts* do not contradict each other; rather, they form a coherent line of case law that the Court will now apply to the present dispute.

### a. Clause 3(b)(1)

While it is not entirely clear from the pleadings, it appears LBH rests its breach of contract, Section 91.401, and declaratory judgment claims on the language of clause 3(b)(1). The clause reads:

> On gas, including casinghead gas or other gaseous substances produced from the Property and sold in good-faith, arms-length transactions by Lessee to *bona fide* third parties who are neither associates, affiliates, or subsidiaries of Lessee, **twenty-five percent (25%) of 8/8ths** of the sales price at the wellhead, to be computed with respect to the character, quality and quantity at the same time or state of operations and by the same methods or formula used by Lessee in sales of its gas to such third parties. "Sales Price" for either oil or gas is defined as being all monies and other things of value of every kind and character received by Lessee or to which Lessee is entitled under any sales contract or entered into good faith negotiations for production from the Property, calculated at the place where the gas is purchased by the third party for each sale.

8

ECF No. 1 at 11 (emphasis in original).

The language at issue is "the sales price at the wellhead." The lease says the "sales price" is to be "calculated at the place where the gas is purchased." ECF No. 1 at 11. Encana reads this clause to be the same as a calculation for the "market value at the well," because the "sales price" is "at the wellhead." Thus, LBH is due a royalty equal to 25% of the downstream price calculated at the point of sale, but adjusted (by deducting post-production costs from the end sales price) to reflect the value of the gas at the wellhead.

LBH disagrees, arguing that the definition of sales prices indicates that it should be calculated at the point of sale, with no post-production cost deductions. LBH also argues that clauses 3(d)(1) and 3(d)(3) support this finding because they clearly state that no post-production costs shall be deducted from the royalty. LBH asserts that the sales price definition is a 'proceeds'-type calculation per *Hyder*, and that it should thus be free of post-production costs as it is distinguishable from the *Heritage* line of cases. Encana, in reply, argues that such a reading would not give effect to the "at the wellhead" language, and that even if the clause could be read to be a 'proceeds'-type royalty, *Warren* would support a finding that the wellhead language is controlling.

Clause 3(b)(1) is not a royalty based on proceeds as LBH claims. It is unlike a proceeds lease in that 3(b)(1) contains the term "at the wellhead." It is analogous to the clause in *Warren*. "Sales price at the wellhead" requires the sales price to be calculated at the wellhead, just as "the amount realized by Lessee, computed at the mouth of the well" language in *Warren* required the net proceeds to be calculated at the wellhead. *Warren*, 759 F.3d at 417. The "calculated at the place where the gas is purchased" language in the sales price definition of 3(b)(1) indicates where the *sales price* is to be calculated. That sales price is then to be computed at the wellhead, which, as the court in *Warren* explains, contemplates the deduction of post-production costs. Therefore,

3(b)(1) functions the same as a "market value at the well" royalty under Texas law, as described in *Hyder*, *Warren*, *Heritage*, and the rest.

LBH argues that language in clause 3(d) of the leases requires a finding that no post-production costs should be deducted from the royalty. 3(d)(1) reads that:

> "in no event shall [LBH] be charged any portion of . . . any expense of Operations . . . including the production, treatment, separation, compression, transportation, or manufacturing of any products that are produced from the Property, except for Lessor's attributable share of production taxes."

ECF No. 1 at 12. 3(d)(3) further states:

> "[Encana] shall at its sole cost and expense, care for, preserve, compress, dehydrate and transport [LBH]'s part of any production from the ground to the point of sale in the same manner as [Encana does its own] part of production . . . ."

ECF No. 1 at 12-13.

"No-deductions" clauses such as 3(d)(1) and 3(d)(3) have been analyzed extensively by both the Texas Supreme Court and the Fifth Circuit, as discussed above. *Hyder* and *Heritage* both state that parties may contract around having post-production costs deducted from a "market value at the well" lease, and the Fifth Circuit applied *Heritage* when analyzing no-deductions clauses in *Warren* and *Potts*. As the Texas Supreme Court states in *Hyder*, "*Heritage Resources* holds only that the effect of a lease is governed by a fair reading of its text." *Hyder*, 483 S.W.3d at 876. It is clear from Texas case law that the text of the royalty clause itself is the key factor in determining if a no-deductions clause is effective.

Clauses 3(d)(1) and (d)(3) of the leases do not alter the point of valuation for the purpose of the royalty calculation, making them unambiguous surplusage that does not free the royalties from post-production costs. As in *Hyder* and *Heritage*, the text of the royalty clause speaks for itself: the point of valuation is the wellhead, so post-production costs must be deducted from the royalty to reach the proper amount from which to calculate the royalty. These positions are

10

reinforced by identical interpretations of Texas state law by the Fifth Circuit in *Warren* and *Potts*. None of the clauses in 3(d) sufficiently circumvent the "at the wellhead" royalty valuation of 3(b)(1)—they are "simply ineffective." *Heritage*, 939 S.W.2d 118 at 130. The clauses prohibit further deductions, but the wording of the royalty clause in 3(b)(1) demands that post-production costs be deducted for the royalty to be valued at the well.

LBH argues that the exception of post-production taxes, which is a post-production expense, shows that 3(d) was meant to exclude all post-production expenses *except for* the taxes; LBH latches on to language in *Hyder* where the Texas Supreme Court indicated that such an inclusion cuts against the producer's argument that no post-production costs should be deducted. However, LBH fails to note that that court *rejected* this argument: "a taxes exception to freedom from production costs is not uncommon in leases, suggesting only that lease drafters are not always driven by logic." *Hyder* at 874. That court ultimately found the wording of the royalty clause itself to be persuasive. As such, this holding is in line with *Hyder*.

### b. Clause 3(b)(2)

It is unclear from LBH's pleadings if they rely on the royalty clause in 3(b)(2) for their claim. However, Encana addresses it in their arguments, and LBH claims that it should be allowed to continue with discovery to determine what payments were made and to whom—presumably, so they can determine whether 3(b)(1) (which applies to *bona fide* third parties) and/or 3(b)(2) (which applies to affiliates of Encana) could provide a basis for their claims. The Court will quickly address 3(b)(2) regardless.

3(b)(2) is a royalty clause that provides LBH a percentage:

> "of the market value at the well of gas . . . produced from the Property and used by [Encana] . . . or sold by [Encana] to its associates, affiliates or subsidiaries . . . or three-sixteenths of the market value at the time of use of the product manufactures, whichever is more favorable to [LBH]. It is expressly stipulated that (A) in either

> event the royalty to be paid shall be computed with respect to the character, quality and quantity of the gas at the time of production, either (1) by the method or formula that is being used in Karnes County, Texas, that is most favorable to [LBH], or (2) by the method or formula being used by [Encana] in *bona fide* sales to third parties not its associates, affiliates, or subsidiaries, whichever method (1) or (2) is most favorable to Lessor . . . ."

ECF No. 13-3 at 4.

This lease is clearly a "market value at the well" royalty under Texas law, as described in *Hyder*, *Warren*, *Heritage*, and the rest. The words are explicitly stated in the lease, and this clause does not suffer from the 'sales price' language of 3(b)(1). Therefore, the analysis above applies directly to 3(b)(2)—post-production costs may be deducted from a royalty based on Encana's affiliate sales, and the 3(d) clauses fail to alter that conclusion in the same manner described above.

### c. Conclusion

On the reasoning explained above, even if LBH's facts are accepted as true and viewed in the light most favorable to them, the majority of their claims fail. Because Encana is paying production royalties in-line with the lease's requirements, there is no breach of the lease regarding royalty payments. There is similarly no violation of TEXAS NATURAL RESOURCES CODE § 91.401, nor any need for a declaratory judgment regarding Encana's legal responsibilities regarding royalty payments under the lease (as there is no genuine controversy under Texas common law). *See Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003). Also, as described above, there is no need for LBH's motion for continuance, as further discovery would not alter the application of Texas law to the leases at issue.

## IV. LBH's Breach of Contract Claim for Failure to Provide an Accounting

LBH also asserts a claim for breach of contract due to Encana's failure to provide an accounting per clause 3(d)(2) of the lease:

> All royalties that are payable under this lease shall be paid to [LBH] . . . [LBH] shall have the right at all reasonable times but with reasonable notice to inspect the books, accounts, contracts, records, and data of [Encana] pertaining to its operations on the Property and sales of production from the Property.

ECF No. 13-3 at 5. LBH claims it has sought an accounting from Encana through several letters between March and September 2016, but that it has yet to receive the requested information. If these facts are taken as true, and in the plaintiff's most favorable light, then LBH has stated a claim for breach of contract under Texas law: there is a valid contract, LBH has tendered performance, Encana breached the contract, and LBH was damaged as a result of the breach. *See Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003). Because this claim survives, LBH's claim for attorney's fees survives as well.

## V. Conclusion

For the aforementioned reasons, Encana's motion to dismiss [ECF No. 8] is **GRANTED** in part and **DENIED** in part. The motion to dismiss [ECF No. 8] is **GRANTED** with respect to LBH's causes of action for breach of contract related to royalty payments, violations of the TEXAS NATURAL RESOURCES CODE, and declaratory judgment. The motion is **DENIED** with respect to LBH's causes of action for breach of contract related to accounting and LBH's claim for attorney's fees. Because LBH's amended complaint was considered in this opinion, LBH's motion for leave [ECF No. 13] is **GRANTED**; LBH's motion to continue on response [ECF No. 14] is **DENIED** as moot.

A separate Order consistent with this Memorandum Opinion was previously issued [ECF No. 30].

Date: June 27, 2018

Royce C. Lamberth
United States District Judge